UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:09-cv-149-RJC

| CHARLES F. GRAHAM, | ) | |
|---|---|---|
| Petitioner, | ) | |
| v. | ) | **ORDER** |
| ALVIN KELLER, JR., Sec. N.C. Dep't of Corr., et al, | ) | |
| Respondent. | ) | |

**THIS MATTER** comes before the Court on Section 2254 Petitioner Charles F. Graham's ("Petitioner") and Respondent Alvin Keller's ("Respondent") cross motions for summary judgment. (Doc. Nos. 11; 14).

**I.     BACKGROUND**

A.     Trial

Evidence at Petitioner's trial showed that on February 16, 2000, the body of seventeen year old Tenisha Bost was found floating in a pond in Huntersville, North Carolina. (September 24 Trial Transcript ("9/24 TT") at 117). She was killed by a single gunshot wound to her head at close range with a .40 caliber hollow-point bullet. (September 26 Trial Transcript ("9/26 TT") at 22, 31-37). Tenisha was six months pregnant with Petitioner's child at the time she was killed. (9/24 TT at 49, 83; 9/26 TT at 68-69). Weeks earlier, Petitioner gave Tenisha money for an abortion, telling her that he already had too many children and wanted her to abort this one. (9/24 TT at 82, 88, & 89). But Tenisha wanted to keep the child. (Id.).

The weekend before Tenisha was found dead, Petitioner asked Bob Casley to accompany him from his home in Charlotte to Huntersville, where Tenisha lived. (9/26 TT at 126). The two

drove separately; Petitioner in his 1988 Cadillac and Casley in a Lincoln. (9/26 TT at 126). They left Petitioner's Cadillac at a shopping center near Tenisha's home. (Id.). Casley then drove Petitioner to Tenisha's home in his Lincoln. (Id. at 127-28). Casley went to the door to ask for Tenisha. (Id.). Tenisha's aunt answered the door and told him that Tenisha was not present because she was suspicious. (Id. at 128; September 27 Trial Transcript ("9/27 TT") at 5-6). Tenisha told her aunt that she did know anyone who drove a Lincoln. (9/27 TT at 6).

On February 15, 2000, Petitioner asked Billy James Abrams to take him to Huntersville at 9 pm. (September 25 Trial Transcript ("9/25 TT") at 120-21). Abrams drove a rented Nissan Altima to Petitioner's home. (Id. at 120-22). Petitioner asked Abrams to follow him up to Huntersville so that Petitioner could leave his Cadillac for his girlfriend. (Id.). Petitioner promised Abrams $15 in exchange for the favor. (Id.). Abrams agreed. (Id.). Another man, Jshehaun Odell Jones, joined them and rode alongside Petitioner to Huntersville. (9/25 TT at 122-23). The men dropped Petitioner's car at a Food Lion grocery store in Huntersville. (Id. at 123-24). Petitioner then drove all three in Abrams's Altima to Tenisha's house. (Id.). Upon Petitioner's request, Abrams fixed the Altima's interior lights so that they would not come on when the car's doors opened. (Id. at 124).

Petitioner stopped the car in front of Tenisha's house, where she and her uncle were standing outside. (9/24 TT at 47, 62). Petitioner had Abrams call out for Tenisha, but she did not respond. (Id.). Abrams then said, "Charles wants to see you." (Id.). Tenisha then approached the car. (9/24 TT at 62; 9/25 TT at 126, 141). Tenisha's uncle testified to hearing, "It's Charles" and seeing three people in the car. (9/24 TT at 62). Tenisha's uncle then heard someone say "didn't I tell you don't call my name." (Id.). Tenisha then got in the car and the four drove back to the Food Lion. (9/25 at 127).

2

Petitioner claimed to have car trouble. (9/25 TT at 127). Petitioner and Jones then got into Petitioner's Cadillac and returned to Tenisha's home, without her. (9/24 TT at 50-61, 63). Petitioner asked Tenisha's uncle where Tenisha was. (Id.). Tenisha's mother came out of the house and asked Petitioner where Tenisha was. (Id.). Petitioner denied any knowledge and denied having been in the Altima moments earlier. (Id.). Tenisha's mother called him a liar and went back in the house. (Id.). Petitioner and Jones then returned to the Food Lion. (9/25 TT at 128). Tenisha then got into the Cadillac with Petitioner. (9/25 at 128-29). Jones got into the Altima with Abrams. (Id.). Abrams and Jones then left for Charlotte. (Id. at 129). Initially, Petitioner and Tenisha followed behind in the Cadillac, but then turned off a few minutes later. (Id.). Abrams and Jones continued to Charlotte. (Id.). No one saw Tenisha alive again.

Abrams went to Petitioner's house around 11pm, hoping to collect the $15 Petitioner had promised him. (9/25 TT at 131-32). Petitioner jumped when he saw Abrams approach him. (Id.). Petitioner gave him $10 and asked him to return the next day for the rest. (Id.).

The next day, Petitioner's girlfriend, Sharon Gains, noticed a significant amount of blood on the passenger side of the Cadillac. (9/25 TT at 45-46). Ms. Gains's child had sat in the car and got blood on her clothes. (Id.). Petitioner told Gains that it was a dog's blood and that he had been fighting dogs. (Id.). When Petitioner picked Gains up from work later that day, she noticed that the blood had been cleaned up. (Id. at 47). In its place, she noted a strong smell and bleach stains in the car. (Id.). Petitioner's neighbor, Roger Ward, testified that he had helped Petitioner clean blood out of Petitioner's Cadillac that week. (Id. at 57). Ward noted a lot of blood on the right, front passenger seat. (Id. at 58). Ward did not believe that such a large amount of blood could have come from a dog. (Id.).

Huntersville Police Officers and a State Bureau of Investigation ("SBI") agent seized

3

Petitioner's Cadillac on February 18, 2000. (9/24 TT at 174). They took samples of blood-stained carpeting and seat covers. (Id.). Evidence showed that the dried blood taken from Petitioner's Cadillac matched Tenisha's. (9/26 TT at 107-108). The state also tested Gains's daughter's jeans to see if that blood matched Tenisa's, but it was unable to develop a genetic profile. (Id. at 104-05). The test did confirm, however, that the stain was human blood. (Id.).

The police also interviewed Petitioner on Feburary 18, 2000. (9/25 TT at 75). Detective Michael Kee testified that Petitioner was very nervous during their interview. (Id.). At one point Kee asked Petitioner to tell the truth. (Id.). Petitioner responded "I can't tell you the truth. If I tell you what you want to hear, they'll take me off the street and they'll give me the needle." (9/25 TT at 75-76). Kee testified that Petitioner was sweating and breathing heavily as he explained that the blood in his car came from a dog. (Id.). Petitioner asked to go to the restroom. (Id.). Kee allowed him to do so, but when Petitioner reached the hallway he collapsed against the wall and fainted. (Id.).

The state also introduced physical evidence connecting Petitioner to the pond where Tenisha was found. Plaster castings of boot impressions found at the pond were consistent with boots seized from Petitioner's closet. (9/24 TT at 121, 166; 9/25 TT at 112; 9/26 TT at 51-54). Examiners were also able to exclude shoes found at Abrams's and Jones's homes. (9/25 TT at 176-78; 9/26 TT at 55-58).

The state introduced a hollow-point .40 caliber bullet seized from Petitioner's dresser at his residence. (9/25 TT at 112; 9/26 TT at 24, 35-36). The bullet was consistent with the one recovered from Tenisha's skull. (Id.).

Jones testified that he saw Petitioner with a gun when he first got into Petitioner's Cadillac on February 15, 2000. (9/25 TT at 207). Later, Jones turned himself in to authorities

4

on unrelated charges. (Id. at 199). Petitioner happened to be getting booked at the same time. (Id.). Jones testified that Petitioner asked him whether he was charged for murder. Jones responded that he was not and asked why he should be. Petitioner then said something to the effect of "he had to kill her, kill the bitch, or he hated to kill her." (Id. at 206). Jones also turned over letters Petitioner had written him while Jones was in jail. (Id. at 203-04). The state entered these letters into evidence. A handwriting expert testified that the writing matched a known sample of Petitioner's handwriting. (9/26 TT at 132, 135-43). In the letters, Petitioner urged Jones to tell police that Abrams "was the one who actually pulled the trigger and killed Tenisha, that he was the actual gunman and that [Jones] was there and that [Jones] was snorting powder at the time, and that [Abrams] had pulled the trigger, and that [Jones and Abrams] eventually dumped her body. (9/25 TT at 203-04). In these letters, Petitioner concocted an elaborate scheme to have Jones incriminate Abrams in Tenisha's murder and begged Jones to make statements against Abrams and to help Petitioner. (Doc. No. 12-12).

Jones admitted that he had been convicted on federal drug charges. (9/26 TT at 7). Jones also admitted that he had given an earlier untrue statement to a private investigator hired by Tenisha's family. (Id. at 9). On the stand, Jones clarified that he was not present when Tenisha was killed and does not know whether Petitioner or Abrams did it. (Id. at 15-16). Earlier, Jones told the investigator that he had been in the car when Abrams shot Tenisha. (Id.). On cross-examination, Petitioner's attorney asked Jones whether he had already received a benefit for testifying against Petitioner. (Id.). Jones answered that he had not. (Id. at 10). Specifically, Jones said, "No, not this case, but [the reduction] was given my testimony per this case as well as accepting responsibility of the prior case that I committed, the crime that I committed." (Id.). On redirect, the state asked Jones, "Did the State of North Carolina make you any promises or

any - give you any deals or sentence reductions for you testifying?" (Id. at 12). Jones answered, "The federal nor state has given me any – I mean, they never said that they would give me a reduction in my time or anything for any testifying in trial or anything, other than the fact the one which was accepting responsibility for my crimes that I committed, and for giving my truthful testimony inside any – any criminal activity I was asked to." (Id. at 12-13).

The jury convicted Petitioner of first-degree murder on October 4, 2002. (Doc. No. 1-13). The jury recommended a sentence of life imprisonment without the possibility of parole, which the court then imposed. (Id.)

B. Procedural History

Petitioner appealed to the North Carolina Court of Appeals. That court found no error. North Carolina v. Graham, 163 N.C. App. 784 (2004). The Court of Appeals found that the trial evidence showed that:

> in the evening hours of 15 February 2000, defendant, with the assistance of two other men, lured the victim, a seventeen-year-old female pregnant with his child, away from her home. Friends of the victim testified defendant had wanted the victim to get an abortion because he already had too many children to support. The victim did not want to abort her child. On 16 February 2000, the victim's body was discovered floating in a lake with a gunshot wound to the head. Defendant's current girlfriend testified defendant was driving a brown 1989 Cadillac on the evening of February 15. When she used the vehicle on February 16, she found blood on the passenger seat. Blood samples obtained by the police from the passenger seat of the Cadillac and from the crime scene matched the victim's DNA.

Id. at *1.

Petitioner filed a petition for discretionary review with the Supreme Court of North Carolina, but that court denied review on December 2, 2004. North Carolina v. Graham, 359 N.C. 193 (2004).

Petitioner filed a pro se Motion for Appropriate Relief ("MAR") in Mecklenburg County

6

Superior Court on March 29, 2005. (Doc. No. 12-4). The MAR court denied Petitioner's motion on February 1, 2006, (Doc. No. 12-5), and his motion to reconsider on October 26, 2006, (Doc. No. 12-7). Petitioner then filed a second MAR in Mecklenburg Superior Court on April 23, 2007. (Doc. No. 1-2). Petitioner alleged that Jones was "promised leniency for his testimony," but that fact was not disclosed to Petitioner. (Doc. No. 1-2 at 6). On May 3, 2007, the court denied Petitioner's second MAR, finding that it did not raise any issues that were not or could not have been raised on direct appeal or in his first MAR. (Doc. No. 1-3). The Court denied Petitioner's motion to reconsider on June 1, 2007. (Doc. No. 12-9). Petitioner filed a writ of certiorari with the North Carolina Court of Appeals on July 26, 2007. See (Doc. No. 1-4). The Court of Appeals remanded to the MAR court for an evidentiary hearing on Petitioner's new claim and ordered the court to appoint counsel for Petitioner. (Id.).

At this hearing, Jones testified that Huntersville homicide investigator Ken Richardson visited him in jail before his testimony in Petitioner's trial. (Doc. No. 1-12 at 7). Jones testified that Richardson told him off the record that he would receive certain benefits if he testified against Petitioner. (Id.).

The state's attorney in Petitioner's trial, Marsha Lynn Goodenow, also testified at this hearing. (Id. at 15). She testified that there was no state deal with Jones in exchange for his testimony. However, Jones did receive a Rule 35 sentence reduction to his federal sentence after he testified in Petitioner's trial. Goodenow told the federal prosecutor that Jones had testified truthfully and that if Jones had instead testified that Abrams killed Tenisha, Petitioner would have been acquitted. (Doc. No. 1-10 at 3).

The court entered an oral order denying Petitioner's motion. (Doc. No. 1-12 at 37-38). The judge found that Jones had no formal deal with prosecutors, but that Richardson did tell

7

Jones off the record that he would receive benefits if he testified. (Id.). The judge further found that Jones "was not told what those benefits would be; [and] that [Jones] testified, at [Petitioner's] trial that he did not observe [Petitioner] kill anyone." (Id. at 38). The judge noted the Rule 35 downward adjustment, but determined that Jones did not receive any benefit as a result of his testimony in Petitioner's trial and that the Petitioner was not prejudiced by the undisclosed conference between Jones and Richardson. (Id.). The judge asked the state to memorialize his oral findings in a written order. (Id.). The written order differed slightly by finding that Jones did not receive a <u>state</u> benefit in exchange for testifying and that Richardson told Petitioner that he <u>might</u> receive a time cut if he testified. (Doc. No. 1-5 at 2-3).

Petitioner filed a petition for writ of certiorari with the North Carolina Court of Appeals on February 19, 2009. (Doc. No. 12-10). The Court of Appeals denied Petitioner's petition on March 17, 2009. (Doc. No. 1-6 at 2). Petitioner then filed his 2254 petition in this Court on April 3, 2009. (Doc. No. 1). This Court dismissed Petitioner's case sua sponte on statute of limitations grounds based on Petitioner's dating error in his petition. (Doc. Nos. 4; 5). When Petitioner moved to reconsider, pointing out his counsel's erroneous dating, the Court reinstated his petition. (Doc. Nos. 7; 8). The case is now before the Court on the parties' cross motions for summary judgment. (Doc. Nos. 11; 14).

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. CIV. P. 56(c)(2); <u>United States v. Lee</u>, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to

8

the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

B. Section 2254 Standard

In addition to the motion for summary judgment standard set forth above, this Court must also consider the Petition for Writ of Habeas Corpus under the requirements set forth in 28 U.S.C. § 2254. Section 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Tice v. Johnson, 647 F.3d 87, 103 (4th Cir. 2011).

A claim is considered "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." Young v. Catoe, 205 F.3d 750, 755 (4th Cir. 2000) (quoting Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999)). A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "It is not enough for us to say that, confronted with the same facts, we

would have applied the law differently; we can accord [Petitioner] a remedy only by concluding that the state court's application of the law in his case was objectively unreasonable." See Tice, 647 F.3d at 103 (citing Williams v. Ozmint, 494 F .3d 478, 483-84 (4th Cir. 2007)). "[W]e will not discern an unreasonable application of federal law unless 'the state court's decision lies well outside the boundaries of permissible differences of opinion.'" Id. at 108 (quoting Goodman v. Bertrand, 467 F.3d 1022, 1028 (7th Cir. 2006)).

C. Brady

The prosecution violates a defendant's due process rights where it suppresses favorable evidence which is material to either guilt or punishment. Strickler v. Greene, 527 U.S. 263, 280 (1999); United States v. Agurs, 427 U.S. 97, 107 (1976); Brady v. Maryland, 373 U.S. 83, 87 (1963). This duty includes impeachment or exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985); Strickler, 527 U.S. at 280. "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Strickler, 527 U.S. at 280 (quoting Bagley, 473 U.S. at 682). "The adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 289-90. "Although this analysis can entail an examination of the nature and strength of the prosecution's case, the materiality test is not an evaluation of the sufficiency of the non-suppressed evidence, nor does it require the defendant to prove, by a preponderance of the evidence, that he would have been acquitted if the suppressed evidence had been disclosed." Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 559 (4th Cir. 1999).

"Moreover, the rule encompasses evidence 'known only to police investigators and not to

the prosecutor.' In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" Strickler, 527 U.S. at 280-81 (quoting Kyles v. Whitley, 514 U.S. 419, 433-34 (1995)). Thus, "[t]here are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Id. at 281-82.

Petitioner can satisfy the first two prongs of this analysis. The state inadvertently suppressed a conversation between Jones and a Huntersville homicide detective in which Jones was promised a reduction in time in exchange for testimony against Petitioner. This information could have been used to impeach Jones and thus qualifies under Brady. Although state prosecutors were not aware the conversation had occurred, the law charges them with the duty to discover such information and divulge it to the defense. See Kyles, 514 U.S. at 433-34.

Petitioner, however, cannot satisfy the prejudice prong. The MAR court found that Petitioner was not prejudiced by the state's failure to divulge this conversation. (Doc. No. 1-12 at 37-38). We must defer to this judgment unless "the state court's decision lies well outside the boundaries of permissible differences of opinion." See Tice, 647 F.3d at 108; Goodman, 467 F.3d at 1028. This Court agrees with the state court's analysis.

In Spicer, the Fourth Circuit held that suppressed impeachment evidence was material, or resulted in prejudice, where "the prosecution presented *no* physical evidence linking [the defendant] to the crime." 194 F.3d at 560. In Spicer, the government's case depended upon three identification witnesses. The suppressed evidence was a previous contradictory statement by one of these three, that he had not seen the defendant on the day in question. This evidence

11

took on even greater importance because of inconsistencies and equivocation in the remaining eye witnesses' testimony. Id. Without any physical evidence to tip the balance, the Court held that the suppression was material. Id.

The Supreme Court has found that suppressed impeachment evidence was immaterial where there was substantial forensic and physical evidence linking the defendant to the crime. Strickler v. Greene, 527 U.S. 263, 280 (1999). In Strickler, the state suppressed impeachment evidence of a purported eye witness to a murder victim's abduction. Even without her testimony the state still had physical evidence suggesting that the murder was committed by more than one individual and other witnesses placed the defendant at the scene. Therefore, the Court held that there was not a reasonable probability that the petitioner's conviction or death sentence would have been different had the suppressed evidence been disclosed. Id. at 296.

Removing Jones's testimony from Petitioner's trial, or introducing further impeachment evidence, would not undermine confidence in Petitioner's conviction. The state introduced evidence of Petitioner's motive to kill Tenisha for her refusal to abort his child. (9/24 TT at 82, 88, & 89). The state also presented evidence of two elaborate trips Petitioner took from Charlotte to Tenisha's residence in Huntersville and an attempt to create an alibi for his plot to kill Tenisha. (9/26 TT at 126-28). The state placed Tenisha with Petitioner in his Cadillac before she died. (9/25 at 128-29). The state connected the large amount of blood in Petitioner's car to Tenisha. (9/26 TT at 107-108). Boot impressions at the pond where Tenisha was found were linked to Petitioner. (9/24 TT at 121, 166; 9/25 TT at 112; 9/26 TT at 51-54). The bullet that killed Tenisha matched one found in Petitioner's dresser. (9/25 TT at 112; 9/26 TT at 24, 35-36). Even without Jones's account of Petitioner's booking confession, the state presented evidence of incriminating statements that Petitioner made to Detective Kee. (9/25 TT at 75-76)

("I can't tell you the truth. If I tell you what you want to hear, they'll take me off the street and they'll give me the needle."). The letters that Petitioner sent Jones can also be considered as they were authenticated by a handwriting expert. (9/26 TT at 132, 135-43). Petitioner incriminated himself in these letters through his attempts to get Jones to lie about who "actually" killed Tenisha. (Doc. No. 12-12). The state's evidence of Petitioner's guilt, independent of Jones, was powerful and would likely have led to his conviction without Jones being called as a witness.

Also, Jones was already substantially impeached on cross examination. He admitted that he had been convicted on federal drug charges. (9/26 TT at 7). Jones also admitted that he had given an earlier untrue statement to a private investigator hired by Tenisha's family. (Id. at 9). Jones testified that he did receive a sentence reduction "per this case as well as accepting responsibility of the prior case that I committed . . . and for giving my truthful testimony inside any – any criminal activity I was asked to." (Id. at 9-13). Additional evidence that a homicide detective had promised Jones a sentence reduction "off the record" would not have likely led to a different result. In United States v. Ellis, the Fourth Circuit held that additional impeachment evidence would not have changed the result of the trial where the witness was already impeached by other evidence before the jury. 121 F.3d 908, 917 (4th Cir. 1997).

Petitioner makes much of the state telling federal prosecutors that Petitioner would have been acquitted if Jones had gone along with Petitioner's story instead of telling the truth. (Doc. No. 1 at 9-10, 17). This is different from establishing that there is a reasonable probability that Petitioner would have been acquitted if Jones's conversation with Richardson had been divulged or if Jones had not testified at all. There is no indication that either of these events would have changed the result of Petitioner's trial. Petitioner's Brady claim is **DENIED**.

13

D. Giglio/Napue

Petitioner separately argues that his conviction should be overturned because the state knowingly failed to correct false testimony. (Doc. No. 1 at 19). To state such a claim, however, Petitioner must show that Richardson's knowledge of the alleged falsity of Jones's denial of any deal is enough. (Doc. No. 1 at 22). The Supreme Court has never extended the prosecution's duty to correct false testimony to a situation where the prosecuting attorneys had no idea that the testimony was false. But see Boyd v. French, 147 F.3d 319, 329-330 (4th Cir. 1998) (Fourth Circuit holding extending Napue to such situations). Thus, the state court's denial of this claim is not clearly contrary any Supreme Court decision. See 28 U.S.C. § 2254(d)(1). But even if this Court found the state court's decision clearly erroneous on this point, Petitioner's conviction must be upheld. As discussed above, the evidence establishing Petitioner's guilt was powerful. There is no reasonable likelihood that the allegedly false testimony could have affected the judgment of the jury. See Kyles, 514 U.S. at 433 at n.7; United States v. Agurs, 427 US. 97, 103 (1976). Petitioner's Giglio argument is also **DENIED**.

III. CONCLUSION

The state's evidence of Petitioner's guilt, independent of Jones's testimony, was overwhelming and would likely have led to his conviction without Jones being called as a witness. Thus, there is no reasonable probability or likelihood that the verdict would have been different if the state had corrected Jones's testimony or divulged the conversation he had with Richardson. Petitioner's conviction stands.

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment, (Doc. No. 11), is **GRANTED**;
2. Petitioner's Motion for Summary Judgment (Doc. No. 14), is **DENIED**;

3. Petitioner's Petition for Writ of Habeas Corpus, (Doc. No. 1), is **DISMISSED**; and

3. It is further ordered that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: March 14, 2012

Robert J. Conrad, Jr.
Chief United States District Judge